Anna L. WOODWORTH,
Plaintiff-Appellant,

v.

KANSAS CITY PUBLIC SERVICE
COMPANY, a Corporation,
Defendant-Respondent.

No. 44043.

Supreme Court of Missouri,

Division No. 1.

Jan. 10, 1955.

Ben W. Swofford, Robert A. Schroeder, John C. Milholland, Kansas City, Mo., Leonard O. Thomas, Richard O. Millsap, Kansas City, Kan., for appellant, Anna L. Woodworth. Swofford, Schroeder & Shankland, Kansas City, Mo., Stanley, Stanley, Schroeder, Weeks & Thomas, Kansas City, Kan., of counsel.

Charles L. Carr, R. Carter Tucker, John Murphy, William H. Wilson, J. Gordon Siddens, C. Thomas Carr, Tucker, Murphy, Wilson & Siddens, Kansas City, Mo., for respondent.

VAN OSDOL, Commissioner.

This is an action for personal injuries sustained by plaintiff when the automobile which she was driving southwardly on 22nd Street was struck by defendant's eastbound streetcar moving on defendant's Chelsea Park Line in Kansas City, Wyandotte County, Kansas. Nine jurors returned a verdict for plaintiff for $13,000; but the trial court set aside the verdict and ensuing judgment and granted defendant a new trial. Plaintiff has appealed.

Plaintiff's case was submitted to the jury on negligence of defendant in moving its streetcar at a high and excessive rate of speed. Defendant had interposed and the trial court submitted the defense of plaintiff's contributory negligence in failing to look out for, and to stop, swerve, or accelerate the speed of her automobile so as to avoid getting into the path of defendant's approaching streetcar.

In sustaining defendant's motion for a new trial, the trial court specified as the ground for sustention of the motion that one of the original veniremen, who was selected as a juror and became the foreman of the jury, failed to disclose on voir dire examination that he had had a "personal injury" claim against defendant, and had also been involved in another accident in which his automobile had collided with defendant's streetcar. The trial court overruled defendant's motion to enter judgment for defendant in accordance with defendant's motion for a directed verdict.

Herein upon appeal, plaintiff-appellant, Anna L. Woodworth, contends the trial court erred in sustaining defendant's motion for a new trial. She says that defendant's evidence, introduced in support of defendant's motion for a new trial, conclusively showed the venireman's failure to answer questions on voir dire was not intentional or willful or with intent to deceive. On the other hand, defendant-respondent, Kansas City Public Service Company, contends the trial court correctly sustained defendant's motion for a new trial on the specified ground; but defendant-respondent also makes the more fundamental contention that defendant's motion to enter judgment for defendant in accordance with defendant's motion for a directed verdict should have been sustained. Defendant-respondent asserts plaintiff failed to make out a submissible case. It is said plaintiff's own testimony shows that, in the circumstances of the collision, she was guilty of contributory negligence as a matter of law. In connection with the latter contention we are reminded that the instant casualty occurred in Kansas, and defendant by its answer seeks to invoke the law of Kansas as applicable to this case. Section 509.220 and Sections 490.070 et seq., RSMo 1949, V.A.M.S.; 42 V.A.M.S.

Supreme Court Rule 3.14. Defendant-respondent also makes the further contentions that the trial court erred in instructing the jury, and that the jury's award was so grossly excessive as to show bias and prejudice on the part of the jury.

In Kansas City, Kansas, 22nd Street, a north-south street, is approximately twenty-six feet wide from curb to curb. At the time of the instant casualty, the street was paved with "black top".

A traveler moving southwardly on 22nd Street approaches and passes over defendant's Chelsea Park Line of two streetcar tracks—an eastbound track, the southerly one, and a westbound track, the northerly one—located on defendant's privately owned right of way. Having crossed over defendant's tracks, the traveler must veer or turn slightly to his right (westwardly) and then slightly to his left as 22nd Street curves slightly to the westward and then straightens out again to a more direct southerly direction.

Defendant's Chelsea Park Line approaches 22nd Street from the west on a broad left-hand turn and angles across 22nd Street in a general southwest-northeast direction.

As the traveler moves southwardly on 22nd Street in approaching defendant's line, he may observe a grove of trees with underbrush or shrubs on his right beginning a few yards north of defendant's tracks and extending to a "dirt road" which passes westwardly from 22nd Street along the north side of defendant's line. Broadly curving back westwardly to the traveler's right, defendant's tracks disappear beyond these trees and shrubs. And between the south side of the dirt road and the north (westbound) track there are poles supporting the westbound trolley lines, a tree, some shrubbery and weeds, all of which somewhat obscure the traveler's view of defendant's tracks west of the crossing. Across defendant's tracks to the southward there is a residence with garage in rear, the garage being about one hundred twenty-five feet west of the crossing.

Approaching 22nd Street, the scene of the collision, defendant's streetcar was moving eastwardly on the south streetcar track. When defendant's streetcar moved through the street, the right front corner of the streetcar collided with the right side of plaintiff's southbound Plymouth coupe. The collision occurred at a point on the south track in the approximate center of the street.

When the collision occurred, plaintiff was on the way from her and her husband's family residence, some distance north of the crossing, to her husband's store near 18th Street and Washington Boulevard. She was taking a container of food to her husband. She had placed the food on dishes within the container and had put the container in the "turtle back" of the Plymouth.

Plaintiff testified she had driven southwardly approaching the streetcar tracks at a low rate of speed—five to ten ("nearer five") miles per hour, "I was going very slow." This, she said, was because the street was rough and had holes "down there this side" of defendant's tracks and "around the tracks", and she didn't want to spill the husband's food. (A witness for plaintiff testified the Plymouth was moving, "I believe five, six, seven miles per hour.")

Plaintiff was familiar with the crossing. She "sometimes" passed over it six times a day. In approaching the crossing she looked for streetcars. She looked to her left when she was about fifteen feet north of the north (westbound) track. She then looked to her right (westwardly). She was then about ten feet north of the north rail of the north (westbound) track, and about twenty-seven and one-half feet from the point of the collision. (The witness-plaintiff explained that she looked to her right when she, personally, was about ten feet north of the north rail of the north track. This would put the front wheels of the Plymouth approximately at the north rail of the north track.) At the time, about six o'clock in an evening in late April, it

was yet daylight, the sun was shining and the streets were dry.

As stated, when plaintiff was about ten feet north of defendant's tracks she looked to her right. She estimated she could see approximately one hundred fifty to one hundred seventy-five feet of defendant's tracks west of 22nd Street. At another place in her testimony she said she could see defendant's tracks as far west as the rear end of the garage south of defendant's line. When she looked to the west, "There was no streetcar there." She then looked back acutely to her left, and there being no westbound streetcar in sight, she did not again look to her right but moved on over the north track and on across and to the point of collision on defendant's south (eastbound) track. She did not swerve or slacken speed or stop. She said if she had seen the streetcar she probably could have stopped; but "if I tried to stop I probably would have stopped at the front of it."

A witness for plaintiff testified that he was moving northwardly on 22nd Street some distance south of defendant's line. He saw plaintiff's Plymouth approaching from the north. He then saw defendant's streetcar. He saw the Plymouth first. It was moving very slowly. The Plymouth's front end was just about to (about five feet from) the first (north) rail of the north track. When he then looked to his left, northwestwardly, and saw defendant's streetcar, it was one hundred to one hundred twenty feet west of the Plymouth. The streetcar was "just about even with the garage." It was going at least forty miles per hour. The witness heard no bell or gong, and "didn't notice that it (the streetcar) slowed down." The streetcar struck the coupe "a little off center, that is, towards the rear of the car." (Another witness said the streetcar struck the "right door" of the Plymouth.) When the Plymouth came to rest after the collision it was south of the south track, headed west, about twenty feet east of the east curb of 22nd Street. The streetcar came to a stop "about fifty foot down, east of the curbing."

(A witness for defendant said the rear end of the streetcar was "just about across" the intersection.)

A passenger on the streetcar, a witness for defendant, testified that, before the streetcar rounded the curve, "I expect it might have been doing thirty-five." Defendant's operator said the streetcar had been moving at twenty-five miles per hour. When the streetcar was seventy-five to one hundred feet from the crossing, the operator looked to the northward and saw no traffic. The Plymouth was twenty-five feet from the point of collision when the operator first observed it. The Plymouth was moving twenty-five miles an hour. The operator "put it in emergency", sanded the rail, and sounded the gong. He had been sounding the gong from "about three hundred feet back." The streetcar was moving twenty miles per hour when it hit the Plymouth.

The Supreme Court of Kansas recognizes the rule which makes it the duty of one about to cross a railroad track to first assure himself he can do so with safety. The rule requires that the diligence of the traveler in so assuring himself must be commensurate with the hazard. And the rule requires that, if the hazard is such that a traveler cannot by the use of sight or hearing assure himself no train is approaching, he must stop or otherwise ascertain that it is safe to cross. McCune v. Thompson, 147 Kan. 57, 75 P.2d 294; Johnson v. Union Pac. R. Co., 157 Kan. 633, 143 P.2d 630; Horton v. Atchison, T. & S. F. Ry. Co., 161 Kan. 403, 168 P.2d 928. In McCune v. Thompson, supra, quoting from Bunton v. Atchison, T. & S. F. R. Co., 100 Kan. 165, at page 168, 163 P. 801, at page 802, it was said, " 'The duty to keep a sharp lookout for trains at a public crossing has often been expounded by this court. A railroad crossing is itself a danger signal. One who proposes to cross a railroad must look and listen. It is not required, in this state, that a person must necessarily stop, in order to look and listen, unless the surroundings and circumstances demand that unusual prudence. If the circumstances do demand

such prudence, then there is a duty to stop, look, and listen. Wehe v. [Atchison, T. & S. F.] Railway Co., 97 Kan. 794, 156 P. 742.'" [147 Kan. 57, 75 P.2d 295.] See also Dickerson v. Missouri-Kansas-Texas R. Co., 149 Kan. 314, 87 P.2d 585; Salisbury v. Wichita R. & Light Co., 103 Kan. 714, 175 P. 966; Kirkland v. Atchison, T. & S. F. R. Co., 104 Kan. 388, 179 P. 362; Moore v. Kansas City Rys. Co., 108 Kan. 503, 196 P. 430; Johnson v. Union Pac. R. Co., supra.

In the case of Burns v. Metropolitan St. R. Co., 66 Kan. 188, 71 P. 244, 246, a traveler in approaching a streetcar track was held to the same or greater precautions than one approaching a railroad track. A railway track itself is a warning of danger, because trains may be expected at any time. Streetcars run many times more frequently than trains and are more silent in their movement. The chance of escaping injury taken by the traveler in crossing the track of a railroad without looking and listening are greater by far than those of a person who in the same negligent way goes over a streetcar track in a city—"Certainly no less vigilance ought to be exercised in the latter case than in the former." However, in Kansas City-Leavenworth R. Co. v. Gallagher, 68 Kan. 424, 75 P. 469, 471, 64 A.L.R. 344, quoting from Lawler v. Hartford St. Ry. Co., 72 Conn. 74, at page 82, 43 A. 545, at page 548, it was said, "'Clearly, it is not negligence in law for one to cross a street railway track in front of an approaching car which he has seen, and which does not appear to him to be dangerously near, and which would not have been so in fact had it been running at its ordinary rate of speed. Whether one who has observed an approaching street car should have also apprehended that it was approaching at such a speed as to reach him before he could cross the track, is generally a question of fact to be determined upon the circumstances of each particular case.'" In the case of the railroad, "the traveler is never regarded as exercising reasonable caution if he loses in a race with the train to the crossing. He is required to yield it the right of way, and not undertake to cross until it has passed. But one who sees a street car approaching may properly cross the track if, under all the circumstances, it is reasonable to suppose there is time for him to do so in safety." Ogden v. Wilson, 120 Kan. 269, 243 P. 284, 285. Thus it seems that, with reference to precautions in approaching streetcar tracks, there has been a modification of the rule governing a traveler's approach to railroad tracks. See again Salisbury v. Wichita R. & Light Co., supra; Kirkland v. Atchison, T. & S. F. R. Co., supra; Moore v. Kansas City Rys. Co., supra.

The statement of a basis for the distinction or modification of the rule has been mentioned in Atchison, T. & S. F. R. Co. v. Schriver, 80 Kan. 540, 103 P. 994, 24 L.R.A., N.S., 492, wherein it was said that the similarity between the operation and management of an ordinary streetcar as compared with a fast running passenger train where speed is important is not so great as to make the rules of management and control identical in each case. Streetcars are constructed and equipped to be operated along streets where people must and do constantly cross. The speed of the streetcar is comparatively slow, and sufficiently uniform to enable people to form a reasonably accurate judgment as to where the danger line is in crossing. The motorman manages the streetcar with the knowledge that danger is always present and safety can only be secured by constant vigilance. The cars are equipped with appliances which, as far as possible, place them under control. People who are in danger expect to be protected from injury only so long as they themselves use ordinary care. This mutual dependence upon each other places the streetcar service upon a plane of its own. It has little in common with the ordinary railroad, where compliance with the demands of public travel requires the operation of heavy passenger trains over long distances with few stops, and, at times, at as great speed as safety will permit. The difference under which these methods of traffic are necessarily operated is obvious and striking, and it seems reasonable that the rules of law applicable to them should be in many respects dissim-

ilar. See also Wiley v. Southwestern Interurban R. Co., 89 Kan. 84, 130 P. 659.

(Even in a railroad crossing case, a plaintiff was held not to have been contributorily negligent as a matter of law in the circumstances of a case where plaintiff in his northbound automobile slowly approached to within about seven feet of the south rail of defendant's tracks and looked to his left, northwestwardly, along the track for a train as far as he could see—two hundred three feet—and could see no train, and listened and could hear none, and then, although it was said that he, when he attempted to cross the track, must have known any approaching train could not stop for him, proceeded to drive onto the track where his automobile was struck by defendant's southeast-bound train. Torgeson v. Missouri-Kansas-Texas R. Co., 124 Kan. 798, 262 P. 564, 55 A.L.R. 1335. If plaintiff Torgeson had stopped his automobile and had walked to the center of the track at the intersection, he could have seen a train approaching from the northwest throughout a distance of about four hundred fifty feet. And from a point thirty-five feet north of the crossing, he could have seen a train approaching from the northwest throughout a distance of eight hundred feet.)

In our case, in considering whether plaintiff made out a submissible case, we shall consider the evidence stated supra from a standpoint favorable to plaintiff.

■ Plaintiff did not see defendant's streetcar. She did not stop, but approached defendant's streetcar tracks slowly; and when she was about ten feet north of the north rail of the north (westbound) track she, having theretofore looked to her left, looked to her right (westwardly) and observed no streetcar within the range of her vision of one hundred twenty-five to one hundred seventy-five feet. When she looked to the westward, she was approximately twenty-seven and one-half feet from the point of collision. It would seem that the front of her car was then about twelve feet from a line which would represent the extent of the "overhang" of a streetcar on defendant's eastbound track. Moving at five miles per hour, she was 3.75 seconds from the point of collision, and defendant's streetcar, assuming it was moving at a rate of speed of forty miles per hour as plaintiff's witness said it was, was about two hundred twenty feet west of the point of collision. If plaintiff was moving at seven miles per hour, she was approximately 2.7 seconds from the point of collision, and defendant's streetcar was about one hundred fifty-seven feet west of the point of collision. But at whatever speed plaintiff was moving—five or seven miles per hour—we accept plaintiff's testimony as true that she looked and there "was no streetcar there" when she was ten feet north of the rail of the north track; and we consequently infer that defendant's streetcar had not reached a point where it could be seen by plaintiff at the time plaintiff looked. No evidence was introduced conclusively demonstrating that defendant's streetcar was at any point nearer and could have been seen by plaintiff when plaintiff looked to the westward. We believe we should not say that plaintiff was guilty of contributory negligence as a matter of law. It seems to us that, when she looked to her right and observed no streetcar approaching from the west within her sight distance of one hundred twenty-five to one hundred seventy-five feet, it could be reasonably said that she was justified in believing no streetcar was dangerously near; and that she could have reasonably relied upon the operator of a streetcar moving eastwardly but beyond the field of her vision to be in the performance of his reciprocal or mutually dependent duty to exercise due care. We think she could have reasonably supposed that any streetcar approaching at a greater distance was being operated by a vigilant motorman at his post and at a reasonable rate of speed, and the motorman being in a position to see and to so manipulate the braking equipment of the streetcar as to take commensurate precautions against striking a vehicle approaching and moving over the crossing. We are of the opinion that the question whether plaintiff was negligent in the circumstances was for the jury.

On voir dire examination of the original panel of veniremen, counsel questioned the panel particularly with respect to whether they or any of them had had a claim against defendant or any of its predecessors. Members of the panel were asked if they (or members of their families) had made claims; or had been paid any money because of an accident "although you didn't make a claim? Now, regardless of how slight. If only a few dollars." Several of the veniremen answered stating the facts of claims they or their relatives had made against defendant and others. Throughout, the venireman, Grindinger, who, as stated, was selected as a trial juror and became the foreman of the jury, remained silent. Counsel also read Section 497.200, RSMo 1949, V.A.M.S., to the jury and advised that any one of the panel could privately make known to the Court any fact which would affect his or her service as a juror. The venireman Grindinger had been convicted of feloniously impersonating a Federal narcotics agent, but had been given an unconditional presidential pardon. It would seem that, because of the pardon, venireman Grindinger was not disqualified by the Section; and counsel did not frame questions so that an answer was required by a venireman who, although convicted of a felony, had been pardoned. But, anyhow, venireman Grindinger did not disclose that he had been convicted of a felony.

In his testimony upon the hearing of evidence upon defendant's motion for a new trial, Grindinger admitted that he had made a claim for "property damage" against defendant in the year 1942, and had received in settlement the small sum of $26. He also admitted that he, in driving his wife's automobile, had collided with one of defendant's streetcars in the year 1951. He said he had made no claim for any property damage sustained in the latter collision. He stated that he had failed to disclose these circumstances to counsel on voir dire because, as he said, he had forgotten them.

■■ Where it is shown that matters which might establish prejudice or work a disqualification were actually gone into on voir dire, and false answers were given, or deception otherwise practiced, the trial court will be permitted to consider the question on motion for a new trial, either upon oral testimony taken at a hearing on the motion, or by affidavit. Such a situation is closely akin to that where a new trial is sought for newly discovered evidence. The "complaining party is not to be left without a remedy for the want of a prior objection and exception, when the disqualification of the juror was one which he by due diligence could not have learned sooner." Harding v. Fidelity & Casualty Co. of New York, Mo.App., 27 S.W.2d 778, 779; Robbins v. Brown-Strauss Corp., 363 Mo. 1157, 257 S.W.2d 643. A trial court's consideration of such a question on motion for a new trial is in the exercise of a discretionary power. Lee v. Baltimore Hotel Co., 345 Mo. 458, 136 S.W.2d 695, 127 A.L.R. 711; Reich v. Thompson, 346 Mo. 577, 142 S.W. 2d 486, 129 A.L.R. 795; Schierloh v. Brashear Freight Lines, Mo.Sup., 148 S.W. 2d 747; Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d 459; Robbins v. Brown-Strauss Corp., supra.

■ Although the claim against defendant by juror Grindinger in 1942 was a small one and the collision in 1951 was apparently not a serious one, yet it was important that these matters should have been frankly disclosed by him upon voir dire in order that counsel could have advisedly made peremptory challenges, and, of course, information procured through a complete disclosure on voir dire often establishes grounds for challenge for cause. "The right of trial by jury guaranteed by our Constitution, if it is to be worth anything, must mean, as this court has said, 'the right to a fair and impartial jury.' * * * Certainly also a party is entitled, unless he waives it, to a jury of twelve impartial qualified men." Lee v. Baltimore Hotel Co., supra [345 Mo. 458, 136 S.W.2d 698]; Piehler v. Kansas City Public Service Co., supra; Moore v. Middlewest Freightways, Inc., Mo.Sup., 266 S.W.2d 578. It is the duty of a venireman on voir dire examination to fully, fairly and truthfully answer all questions, so that challenges may be in-

telligently exercised, and the venireman's intentional concealment of a material fact may require the granting of a new trial. A prospective juror is not the judge of his own qualifications. Bass v. Durand, 345 Mo. 870, 136 S.W.2d 988; Piehler v. Kansas City Public Service Co., supra. Even though the juror Grindinger was produced as a witness by defendant in support of defendant's motion for a new trial and he testified that, at the time of the voir dire examination, he had forgotten the facts of his claim against defendant for property damage in 1942 and of his collision with defendant's streetcar in 1951 and his testimony was not controverted, the trial court was not bound by his testimony; nor was the trial court bound by the juror's affidavit that he was not prejudiced against defendant. Reich v. Thompson, supra. The trial judge was present and presiding at the time of the voir dire examination and again when the juror was testifying in support of the new trial motion. The trial judge was in an excellent position to observe the venireman-juror's attitude and demeanor and to determine if he had intentionally concealed the facts so material to the question of the possibility of his prejudice. Certainly a trial judge is in a better position to gauge the prejudicial effect of trial courtroom events than are we. So it has been often said that appellate courts are more liberal in upholding a trial court's action in sustaining a motion for a new trial than in denying it.

We are also of the opinion the trial court's apparent inadvertence in referring, in its order granting a new trial, to the claim of 1942 as a "personal injury" claim, whereas, in fact it was a claim for property damage only, did not so infuse the trial court's order with error as to demand a reversal of the order.

Plaintiff-appellant further argues that defendant Company had in its archives the record of the venireman's claim of 1942, and so had knowledge thereof and could not have been prejudiced by the venireman's failure to answer. While there was no showing that defendant's counsel at the time of the trial did not have the information which defendant Company's archives would have disclosed, there was no showing that defendant's counsel did know of the circumstance of the venireman's claim. In similar circumstances, this court in Reich v. Thompson, supra, treated with and ruled adversely to a like contention in that case wherein the trial court, as herein, sustained the motion for a new trial.

There was a substantial factual foundation for the trial court's ruling— the venireman Grindinger did in fact fail to disclose the facts of his claim against defendant and of his collision with defendant's streetcar—and we defer to the trial court's apparent views that such failure to disclose was intentional, and that defendant was thereby prejudiced. We believe we should not say the trial court abused its discretion in sustaining defendant's motion for a new trial.

It now would be of no purpose to examine defendant-respondent's contention of the excessiveness of the jury's award; and we shall not prolong this opinion by examining the contentions of error in instructing the jury. Counsel are now advised of the contentions, and errors in instructing the jury, if apparent, may be avoided when the case is retried.

The order granting a new trial should be affirmed, and the cause remanded.

It is so ordered.

LOZIER and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All concur except WESTHUES, J., not sitting.